ESTATE OF AIRDRIE K. PINKERTON, DECEASED, ROY D. PINKERTON, ET. AL., EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Pinkerton v. Commissioner
Docket No. 2066-69.
United States Tax Court
T.C. Memo 1974-71; 1974 Tax Ct. Memo LEXIS 247; 33 T.C.M. (CCH) 342; T.C.M. (RIA) 74071; March 26, 1974, Filed. Jack M. Harrison and Raymond L. Heidemann, for the petitioner. Melvern Stein, for the respondent. TIETJENS
MEMORANDUM FINDINGS OF FACT AND OPINION TIETJENS, Judge:* The Commissioner determined a deficiency of $92,166.95 in the Federal estate tax of Airdrie K. Pinkerton (hereafter decedent). [1]
*248 The issues for decision are: (1) the value of certain shares of stock owned by decedent at her death; and (2) the extent to which decedent's funeral expenses may be deducted from her gross estate. FINDINGS OF FACT The stipulated facts are so found and are incorporated herein by this reference. Decedent, a resident of Ojai, California, died testate on June 26, 1966. Roy D. Pinkerton (hereafter petitioner), of Ojai, California, Airdrie Paula Martin, of Ojai, California, and Roy H. Pinkerton, of Sacramento, California, are the duly appointed, qualified and acting executors of decedent's will. On or about May 8, 1967, petitioner filed a Federal estate tax return with the district director of internal revenue at Los Angeles, California, and elected to use the date of decedent's death as the date of valuation of the estate. Decedent's estate was administered under the jurisdiction of California. Decedent's funeral expenses of $510.50 were paid by decedent's estate. At the time of her death, decedent owned a one-half community property interest in the following shares of corporate stocks: (a) 16 shares of Class A capital stock of John P. Scripps Newspapers. (b) 16 *249 shares of Class B capital stock of John P. Scripps Newspapers. (c) 10 shares of Class A capital stock of Tulare Newspapers, Inc.
(d) 10 shares of Class B capital stock of Tulare Newspapers, Inc.
(e) 10 shares of Class A capital stock of Watsonville Newspapers, Inc. (f) 10 shares of Class B capital stock of Watsonville Newspapers, Inc. (g) 10 shares of Class A capital stock of Redding Record, Inc. (h) 30 shares of Class B capital stock of Redding Record, Inc. The Class A, no par capital stock of each of the four corporations is voting stock whereas the Class B is non-voting. In all other respects there is no distinction between the Class A and Class B stock of any of the corporations. There have never been any sales of shares of capital stock of any of the four subject corporations from which the fair market value of such shares could be determined as of June 26, 1966. John P. Scripps Newspapers John P. Scripps Newspapers (hereafter Scripps), was incorporated under the laws of the State of California in 1935. From March 1935 until the date of decedent's death, the issued and outstanding capital stock of Scripps was owned as follows: Class A, no-par shares
Class B, no-par shares
Total Decedent and her surviving husband, Roy D. Pinkerton, as community property
16
16
32
John P. Scripps
64
32
96
Edgar F. Elfstrom and Thelma A. Elfstrom, Trustees
16
16
32
Totals
96
64
160
*250 As of June 26, 1966, Scripps published the daily Ventura County Star-Free Press (hereafter the Star-Free Press) in Ventura, California, and the daily News-Chronicle in Thousand Oaks, California. The Star-Free Press was acquired by Scripps in 1946 although it was started as a daily newspaper by Roy D. Pinkerton on June 15, 1925. The News-Chronicle is the successor of the Conejo News, a weekly newspaper purchased by Scripps in 1961. The Star-Free Press is circulated throughout Ventura County, California, and the News-Chronicle is circulated in Southeastern Ventura County. As of June 26, 1966, the Star-Free Press was printed on a six unit Goss letter press which was approximately 40 years old. Throughout the industry, letter presses were becoming obsolete and were being replaced by more modern offset presses. The market for used letter presses was very depressed. As of June 26, 1966, the News-Chronicle was printed on a three unit offset press. The News-Chronicle operated from two different buildings, one of which was an old, remodeled church which had become inadequate for the newspaper's needs. It was not adaptable to remodeling, and the cost of replacing it was estimated *251 at from $150,000 to $200,000. As of June, 1966, there were profit-sharing agreements in existence between Scripps and certain of its key employees. On December 7, 1965, the executive committee of Scripps increased the reserve account from $350,000 to $400,000 from its earned surplus to provide for its liability under the profit-sharing agreements. The following schedules reflect certain information relevant to our determination of the value of decedent's interest in Scripps: (1) John P. Scripps Newspapers
Net Income Before Federal Income Taxes
Federal Income Taxes
Dividends Paid 1956
$235,507
$115,595
$ 38,400
1957
231,239
114,709
38,400
1958
244,319
121,250
38,400
1959
304,759
151,949
38,400
1960
315,262
157 ,258
76,800
1961
350,721
175,642
76,800
1962
232,326
114,076
76,800
1963
227,006
111,296
76,800
1964
141,322
42,091
76,800
1965
264,817
111,709
76,800
1966
242,585
106,739
76,800 (2) Ventura County Star-Free Press
Total Revenues
Net Operating Profit
Average Paid Daily Circulation
Total Pages Printed
Total Advertising Inches 1956
$1,071,561
$237,693
19,961
7,220
737,812
1957
1,131,237
237,131
20,342
7,464
749,857
1958
1 ,206,284
249,056
21,449
7,418
720,278
1959
1,374,926
306,645
23,182
7,936
796,813
1960
1,534,811
309,115
23, 995
8,130
837,941
1961
1,700,785
397,695
24,230
8,462
868,567
1962
1,767,893
353,332
25,090
8,796
881,181
19 63
1,937,494
385,787
26,208
9,438
903,827
1964
2,080,790
378,611
27,627
10,236
964,335
1965
2,338,131
456,496
28,894
10,534
1,020,221
1966
2,535,362
317,582
29,273
12,170
1,065,433
(3) News-Chronicle
Total Revenues
Net Operating (Loss)
Average Paid Daily Circulation
Total Pages Printed
Total Advertising Inches 7 months ended December 31,
1961
$ 60,661
[50,997)
1,308
778
63,526
1962
151,491
(119,884)
2,454
1,636
150,922
1963 *
191,46 2
(154,583)
3,829
2,020
181,857
1964**
244,632
(220,232)
4,662
2,810
198,267
1965
347,020
(187,636)
4,310
3,540
230,896
1966
509,111
( 36,577)
6,285
4,409
326,491
*252 (4) John P. Scripps Newspapers (a) For the Years 1961, 1962, and 1963
1961
1962
1963 Circulation income
$ 358,990
$ 384,123
$ 411,168
Advertising income
1,392,824
1,520,708
1,701,932
Miscellaneous income (shopping news circulars, commercial printing, etc.)
9,631
14,553
15,855
Interest income
12,463
7,853
4,009
Dividend income
2,790
2,790
2,790
Gain or (loss) on sale of capital assets
(1,155)
(40)
89
Total Income
$1,775,543
$1,929,987
$2,135,843
Operating expense*
1,415,502
1,687,548
1,898,605
Interest expense
9,320
10,113
10,232
Operating profit before Federal income taxes
$ 350,721
$ 232,326
$ 227,006
Federal income taxes
175,642
114,076
111,296
Net profit after Federal income taxes
$ 175,079
$ 118,250
$ 115,710 *Includes depreciation expense in the amounts of
$ 40,350
$ 42,431
$ 42,071
(b) For the years 1964, 1965, and 1966
1964
1965
1966 Circulation income
$ 445,719
$ 469,661
$ 550,775
Advertising income
1,861,176
2,125,653
2,387,390
Miscellaneous income (shopping news, circulars, commercial printing)
18,526
170,565
265,965
Interest income
4,485
5,323
4,807
Dividend income
2,790
2,790
2,836
Gain or (loss) on sale of capital assets
(276)
1,384
(367)
Total Income
$2,332,420
$2,775,376
$3,211,406
Operating expense*
2,167,921
2,482,207
2,924,238
Interest expense
23,177
28,352
44,583
Operating profit before federal income taxes
$ 141,322
$ 264,817
$ 242,585
Federal income taxes**
42,091
111,709
106,739
Net profit after federal income taxes
$ 99,231
$ 153,108
$ 135,846 *Includes depreciation expense in the amounts of
$ 53,387
$ 70,717
$ 78,686 **After reduction for investment credits in the amounts of
$ 20,385
$ 7,641
$ 2,105
*253 (5) John P. Scripps Newspapers (a) As of December 31, 1961 and 1962 Assets
12/31/61
12/31/62 Cash on hand and in banks
$ 208,618
$ 105,591
Securities at cost
85,824
160,824
Notes and accounts receivable - net
315,973
208,368
Inventories and supplies
45,699
41,236
Land, buildings and equipment - net
507,293
657,502
Goodwill - purchased
49,827
49,827
Deferred charge
8,105
7,969
Organization expense
599
599
Miscellaneous assets
12,308
975
Total Assets
$1,234,246
$1,232,891
Liabilities and Capital
Current liabilities
$ 182,267
$ 140,409
Notes payable-non-current
163,145
166,510
Prepaid subscriptions
5,379
5,647
Miscellaneous non-current liabilities
10,706
6,127
Reserve for liability under employee profit sharing agreements
350,000
350,000
Capital stock (160 shares)
1,600
1,600
Capital surplus
98,631
98,631
Earned surplus
422,518
463,967
Total Liabilities and Capital
$1,234,246
$1,232,891
(b) As of December 31, 1963 and 1964
Assets
12/31/63
12/31/64
Cash on hand and in banks
$ 114,252
$ 97,958
Securities at cost
173,162
194,061
Notes and accounts receivable - net
217,189
262,751
Inventories and supplies
42,609
51,710
Land, buildings and equipment - net
638,946
957,925
Goodwill - purchased
49,827
49,827
Deferred charge
8,663
10,040
Organization expense
599
599
Miscellaneous assets
56,728
90
Total Assets
$1,301,975
$1,624,961
Liabilities and Capital
Current liabilities
$ 168,269
$ 114,640
Notes payable-non-current
169,415
523,970
Prepaid subscriptions
7,316
7,791
Miscellaneous non-current liabilities
3,867
3,020
Reserve for liability under employee profit sharing agreements
350,000
350,000
Capital stock (160 shares)
1,600
1,600
Capital surplus
98,631
98,631
Earned surplus
502,877
525,309
Total Liabilities and Capital
$1,301,975
$1,624,961
(c) As of December 31, 1965 and June 30, 1966
Assets
12/31/65
6/30/66
Cash on hand and in banks
$ 175,057
$ 117,625
Securities at cost
194,061
194,061
Notes and accounts receivable - net
323,904
325,298
Inventories and supplies
44,759
60,262
Land, buildings and equipment - net
1,091,831
1,064,634
Goodwill - purchased
274,827
274,827
Deferred charge
62,897
66,519
Organization expense
599
599
Miscellaneous assets
316
4,967
Total Assets
$2,168,251
$2,108,792
Liabilities and Capital
Current liabilities
$ 232,358
$ 212,709
Notes payable-non-current
871,606
774,107
Prepaid subscriptions
9,534
11,170
Miscellaneous non-current liabilities
2,905
2,557
Reserve for liability under employee profit sharing agreements
400,000
400,000
Capital stock (160 shares)
1,600
1,600
Capital surplus
98,631
98,631
Earned surplus
551,617
608,018
Total Liabilities and Capital
$2,168,251
$2,108,792
*254 (6) Securities owned by John P. Scripps Newspapers as of December 31, 1965, and June 30, 1966 Description
Cost $ 50,000 U.S. Treasury bonds - 4% of 8/15/70
$ 50,000
40,000 U.S. Treasury bonds - 2 1/2% of 6/15/69
37,337
20,000 U.S. Treasury bonds - 3 7/8% of 5/15/68
20,000
10,000 U.S. Treasury bonds - 2 1/2% of 12/15/69
10,000
558 shares of 5% Series "A" cumulative preferred stock of E.W. Scripps Company
55,824
100 shares of common capital stock (20% interest) by Entsunews, Inc., publisher of Simi-Enterprise-Sun & News, Simi, California
20,900
Total
$194,061
Tulare Newspapers, Inc.
Tulare Newspapers, Inc. (hereafter Tulare) was incorporated under the laws of the State of California in 1945. From the date of incorporation until the date of decedent's death, the issued and outstanding capital stock of the corporation was owned as follows: Class A, no-par shares
Class B, no-par shares
Total Decedent and her surviving husband, Roy D. Pinkerton, as community property
10
10
20
John P. Scripps
80
80
160
Harry Green
10
10
20
Totals
100
100
200
As of June 26, 1966, Tulare's principal business activity consisted *255 of the publication of a daily newspaper, the Tulare Advance Register and Tulare Times (hereafter the Register-Times) in Tulare, California. The Register-Times was started as a daily newspaper by Tulare in December 1945. The Register-Times is circulated in Tulare County. As of June 26, 1966, the plant and equipment used in the production of the Register-Times was old and outdated. The Register-Times was printed on a Goss letter press, and, in 1966, the estimated cost of converting to an offset press operation was $300,000. Tulare did not pay any dividends during the years 1956 through 1970. The following schedules reflect certain information relevant to our consideration of the value of decedent's interest in Tulare: (1) Tulare Newspapers, Inc.
Net Income Before Federal Income Taxes
Federal Income Taxes 1956
$16,480
$ 4,944
1957
11,273
3,382
1958
23,509
7,053
1959
21,136
5,741
1960
34,877
12,636
1961
10,244
3,073
1962
12,832
3,850
1963
1,498
444
1964
38,393
11,102
1965
34,550
11,506
1966
26,087
7,335
(2) Tulare Advance Register and Tulare Times (2) Tulare Advance Register and Tulare Times Total Revenues
Net Operating Profit
Average Paid Daily Circulation
Total Pages Printed
Total Advertising Inches 1956
$286,144
$ 24,661
4,771
3,454
283,154
1957
280,708
19,082
4,847
3,432
268,919
1958
311, 533
31,034
4,819
3,426
274,907
1959
318,871
16,673
5,047
3,508
271,769
1960
377,477
42,420
5,018
3,740
290 ,573
1961
362,652
17,980
5,200
3,728
277,760
1962
385,629
20,239
5,239
3,896
289,867
1963
390,294
4,972
5,2 59
4,028
273,175
1964
416,020
42,153
5,201
3,836
281,859
1965
433,067
39,725
5,353
3,826
284,406
1966
461,515
30,832
5,599
4,126
296,728
*256 (3) Tulare Newspapers, Inc. (a) For the years 1961, 1962, and 1963
1961
1962
1963 Circulation income
$ 63,189
$ 63,417
$ 67,449
Advertising income
289,328
307,141
308,464
Miscellaneous income (shopping news, circulars, commercial printing, etc.)
10,135
15,071
14,381
Gain on sale of capital assets
-0-
-0-
2,000
Total Income
$362,652
$385,629
$392,294
Operating expense *
344,672
365,391
385,322
Interest expense
7,736
7,406
5,474
Operating income before federal income taxes
$ 10,244
$ 12,832
$ 1,498
Federal income taxes
3,073
3,850
444
Net profit after federal income taxes
$ 7,171
$ 8,982
$ 1,054 *Includes depreciation expense in the amounts of
$ 5,351
$ 5,350
$ 5,297
(b) For the Years 1964, 1965, and 1966
1964
1965
1966
Circulation income
$ 74,309
$ 76,647
$ 79,477
Advertising income
322,975
330,488
347,372
Miscellaneous income (shopping news, circulars, commercial printing, etc.)
18,736
25,932
34,666
Interest income
-0-
-0-
60
Gain on sale of capital assets
1,333
-0-
-0-
Total Income
$417,353
$433,067
$461,575
Operating expense *
373,867
393,342
430,682
Interest expense
5,093
5,175
4,806
Operating income before federal income taxes
$ 38,393
$ 34,550
$ 26,087
Federal income taxes**
11,102
11,506
7,335
Net profit after federal income taxes
$ 27,291
$ 23,044
$ 18,752 *Includes depreciation expense in the amounts of
$ 6,167
$ 7,041
$ 7,260 **After reduction for investment credits in the amounts of
$ 2,276
$ 78
$ 187
*257 (4) Tulare Newspapers, Inc. (a) As of December 31, 1961 and 1962 Assets
12/31/61
12/31/62 Cash on hand and in banks
$ 53,822
$ 39,586
Notes and accounts receivable - net
37,694
41,444
Inventories and supplies
10,111
6,386
Land, buildings and equipment - net
68,964
64,993
Goodwill - purchased
84,630
84,630
Deferred charges
1,730
1,829
Total Assets
$256,951
$238,868
Liabilities and Capital
Current liabilities
$ 18,673
$ 15,026
Notes payable-non-current
129,441
106,035
Prepaid subscriptions
2,827
2,858
Miscellaneous non-current liabilities
492
448
Capital stock (200 shares)
2,000
2,000
Earned surplus
103,518
112,501
Total Liabilities and Capital
$256,951
$238,868
(b) As of December 31, 1963 and 1964
Assets
12/31/63
12/31/64 Cash on hand and in banks
$ 22,523
$ 33,637
Notes and accounts receivable - net
36,817
43,190
Inventories and supplies
6,544
4,345
Land, buildings and equipment - net
61,847
88,030
Goodwill - purchased
84,630
84,630
Deferred charges
1,854
2,144
Total Assets
$214,215
$255,976
Liabilities and Capital
Current liabilities
$ 10,301
$ 23,259
Notes payable-non-current
84,885
86,249
Prepaid subscriptions
3,084
3,062
Miscellaneous non-current liabilities
390
560
Capital stock (200 shares)
2,000
2,000
Earned surplus
113,555
140,846
Total Liabilities and Capital
$214,215
$255,976
(c) As of December 31, 1965 and June 30, 1966
Assets
12/31/65
6/30/66 Cash on hand and in banks
$ 53,022
$ 66,082
Notes and accounts receivable - net
49,697
41,605
Inventories and supplies
6,177
4,927
Land, buildings and equipment - net
82,098
81,740
Goodwill - purchased
84,630
84,630
Deferred charges
2,822
2,334
Total Assets
$278,446
$281,318
Liabilities and Capital
Current liabilities
$ 29,193
$ 17,067
Notes payable-non-current
79,744
80,096
Prepaid subscriptions
3,009
3,516
Miscellaneous non-current liabilities
610
590
Capital stock (200 shares)
2,000
2,000
Earned surplus
163,890
178,049
Total Liabilities and Cpaital
$278,446
$281,318
*258 Watsonville Newspapers, Inc. Watsonville Newspapers, Inc. (hereafter Watsonville) was incorporated under the laws of the State of California in December 1945. From the date of incorporation until the date of decedent's death, the issued and outstanding capital stock of Watsonville was owned as follows: Class A, no-par shares
Class B, no-par shares
Total Decedent and her surviving husband, Roy D. Pinkerton, as community property
10
10
20
John P. Scripps
60
60
120
Harry Green
10
10
20
Edgar F. Elfstrom and Thelma A. Elfstrom, Trustees
20
20
40
Totals
100
100
200
As of June 26, 1966, Wastsonville's principal business activity consisted of the publication of a daily newspaper, the Watsonville Register-Pajaronian (hereafter the Register-Pajaronian) in Watsonville, California. Watsonville acquired the Register-Pajaronian on December 31, 1945. The Register-Pajaronian is circulated in Monterey and Santa Cruz Counties. As of June 26, 1966, old equipment and an inadequate leased building were used in the production of the Register-Pajaronian. The Register-Pajaronian had been printed on letter press but was converted to offset press *259 in 1969 at an approximate cost of $700,000, which included the cost of the property necessary to the conversion. As of June 26, 1966, there were profit-sharing agreements in existence between Watsonville and certain of its key employees. On December 3, 1965, the executive committee of Watsonville increased the reserve account in the amount of $50,000 from its earned surplus to provide for its liability under the profit-sharing agreements. The following schedules reflect certain information relevant to our consideration of the value of decedent's interest in Watsonville: (1) Watsonville Newspapers, Inc. Net Income Before Federal Income Taxes
Federal Income Taxes
Dividends Paid 1956
$ 56,942
$24,110
$ 18,000
1957
58,637
24,991
18,000
1958
55,590
23,205
18,000
1959
58,104
24,106
18,000
1960
76,284
33,56 0
24,000
1961
50,702
20,257
24,000
1962
68,517
29,521
24,000
1963
76,434
33,524
24,000
1964
115,710
48,784
24,000
1965
117,723
48,898
35,000
1966
110,925
46,070
36,000
(2) Watsonville Register-Pajaronian Total Revenues
Net Operating Profit
Average Paid Daily Circulation
Total Pages Printed
Total Avertising Inches 1956
$378,691
$ 60,245
7,449
3,908
364,855
1957
379,968
62,151
7,632
3,796
342,723
1958
380,879
57, 889
7,749
3,772
340,929
1959
393,623
57,832
7,905
3,742
328,262
1960
456,838
74,919
8,133
4,040
347,843
196 1
444,464
48,212
8,287
4,042
338,385
1962
516,011
67,835
8,389
4,386
367,346
1963
579,539
75,063
8,471
4,7 94
394,275
1964
694,936
113,954
8,654
5,370
456,473
1965
730,650
114,175
8,910
5,468
458,056
1966
760,692
104,836
9,278
5,586
467,850
*260 (3) Matsonville Newspapers, Inc. (a) For the years 1961, 1962 and 1963
1961
1962
1963 Circulation income
$106,320
$106,265
$108,441
Advertising income
333,372
398,007
447,308
Miscellaneous income (shopping news, circulars, commercial printing, etc.)
4,772
11,739
23,791
Interest income
6,588
6,973
6,718
Dividend income
1,375
1,375
1,375
Gain on sale of capital assets
-0-
(1,171)
422
Total Income
$452,427
$523,188
$588,055
Operating expense*
396,252
448,176
504,476
Interest expense
5,473
6,495
7,145
Operating income before federal income taxes
$ 50,702
$ 68,517
$ 76,434
Federal income taxes
20,257
29,521
33,524
Net profit after federal income taxes
$ 30,445
$ 38,996
$ 42,910 *Includes depreciation expense in the amounts of
$ 8,488
$ 8,420
$ 7,175
(b) For the years 1964, 1965, and 1966
1964
1965
1966
Circulation income
$128,707
$131,452
$135,685
Advertising income
531,016
566,755
599,164
Miscellaneous income (shopping news, circulars, commercial, printing, etc.)
35,213
32,443
25,844
Interest income
6,848
8,158
12,112
Dividend income
1,375
1,375
1,375
Gain on sale of capital assets
-0-
3
-0-
Total Income
$703,159
$740,186
$774,180
Operating expense*
580,982
616,474
655,856
Interest expense
6,467
5,989
7,399
Operating income before federal income taxes
$115,710
$117,723
$110,925
Federal income taxes**
48,784
48,898
46,070
Net profit after federal income taxes
$ 66,926
$ 68,825
$ 64,855 *Includes depreciation expense in the amounts of
$ 7,609
$ 8,399
$ 8,651 **After reduction for investment credits in the amounts of
$ 1,487
$ 548
$ 113
*261 (4) Watsonville Newspapers, Inc. (a) As of December 31, 1964 and 1962 Assets
12/31/61
12/31/62 Cash on hand and in banks
$ 40,203
$ 63,048
Securities at cost
97,629
97,629
Notes and accounts receivable - net
119,276
129,970
Inventories and supplies
9,106
8,690
Land, buildings and equipment - net
58,374
53,255
Goodwill - purchased
104,293
104,293
Deferred charges
1,235
2,676
Total Assets
$430,116
$459,561
Liabilities and Capital
Current liabilities
$ 34,633
$ 49,953
Notes payable-non-current
92,009
93,084
Prepaid subscriptions
7,646
6,776
Miscellaneous non-current liabilities
3,588
2,512
Reserve for liability under employee profit sharing agreements
125,000
125,000
Capital stock (200 shares)
2,000
2,000
Earned surplus
165,240
180,236
Total Liabilities and Capital
$430,116
$459,561
(b) As of December 31, 1963 and 1964
Assets
12/31/63
12/31/64
Cash on hand and in banks
$ 81,580
$119,732
Securities at cost
115,054
115,054
Notes and accounts receivable - net
105,111
120,975
Inventories and supplies
6,096
10,868
Land, buildings and equipment - net
56,172
69,800
Goodwill - purchased
104,293
104,293
Deferred charges
2,514
2,069
Miscellaneous assets
1,500
1,000
Total Assets
$472,320
$543,791
Liabilities and Capital
Current liabilities
$ 48,969
$ 71,169
Notes payable-non-current
88,089
94,350
Prepaid subscriptions
7,379
7,583
Miscellaneous non-current liabilities
1,737
1,617
Reserve for liability under employee profit sharing agreements
118,500
112,000
Capital stock (200 shares)
2,000
2,000
Earned surplus
205,646
255,072
Total Liabilities and Capital
$472,320
$543,791
(c) As of December 31, 1965 and June 30, 1966
Assets
12/31/65
6/30/66
Cash on hand and in banks
$ 60,763
$ 35,194
Securities at cost
115,054
115,054
Notes and accounts receivable - net
218,510
211,740
Inventories and supplies
9,808
11,577
Land, buildings and equipment - net
69,226
126,818
Goodwill - purchased
104,293
104,293
Deferred charges
4,555
12,416
Miscellaneous assets
1,000
1,000
Total Assets
$583,209
$618,092
Liabilities and Capital
Current liabilities
$ 70,089
$ 45,850
Notes payable-non-current
100,594
135,095
Prepaid subscriptions
8,103
8,914
Miscellaneous non-current liabilities
1,526
1,994
Reserve for liability under employee profit sharing agreements
155,500
149,000
Capital stock (200 shares)
2,000
2,000
Earned surplus
245,397
275,239
Total Liabilities and Capital
$583,209
$618,092
*262 (5) Securities owned by Watsonville
As of December 31, 1965 and June 30, 1966 Description
Cost $50,000 U.S. Treasury bonds - 2 1/2% of 6/15/69
$ 47,412
30,000 U.S. Treasury bonds - 4% of 8/15/70
30,000
10,000 U.S. Treasury bonds - 3 7/8% of 5/15/68
10,125
275 shares of 5% Series "A" cumulative preferred stock of E.W. Scripps Company
27,517
Total
$115,054
Redding Record, Inc. Redding Record, Inc. (hereafter Redding) was incorporated under the laws of the State of California on October 17, 1938. From the date of incorporation until the date of decedent's death, the issued and outstanding capital stock of Redding was owned as follows: Class A, no-par shares
Class B, no-par shares
Total Decedent and her surviving husband, Roy D. Pinkerton, as community property
10
30
40
John P. Scripps
80
40
120
Paul C. Bodenhamer
5
15
20
Harry O. Bostwick, Jr.
5
15
20
Totals
100
100
200
As of June 26, 1966, Redding's principal business activity consisted of the publication of a daily newspaper, the Redding Record-Searchlight and The Courier-Free Press (hereafter the Record-Searchlight), in Redding, California. Redding *263 started the Record-Serachlight on October 17, 1938. The Record-Searchlight is circulated in Shasta County. As of June 26, 1966, the Record-Searchlight was printed on a forty year old five unit letter press and production was carried on in two separate locations, one of which was owned by Redding and the other leased. The estimated cost of consolidating operations and converting to an offset press was $950,000. As of June 26, 1966, there were profit-sharing agreements in existence between Redding and certain of its key employees. On December 3, 1965, the executive committee of Redding increased the reserve account from $125,000 to $200,000 from its earned surplus to provide for its liability under the profit-sharing agreements. The following schedules reflect certain information relevant to our consideration of the value of decedent's interest in Redding: (1) Redding Record, Inc. Net Income Before Federal Income Taxes
Federal Income Taxes
Dividends Paid 1956
$ 95,545
$ 44,183
$ 18,000
1957
94,939
43,862
18,000
1958
98,571
45,707
18,000
1959
122,941
58,429
18,000
1960
136,391
65,424
18,000
1961
146,0 02
70,421
38,000
1962
148,292
71,551
48,000
1963
154,890
74,416
48,000
1964
230,570
106,124
60,000
1965
275,167
124,867
72,000
1966
267,672
117,126
72,000
*264 (2) Redding Record-Searchlight & The Courier-Free Press Total Revenues
Net Operating Profit
Average Paid Daily Circulation
Total Pages Printed
Total Advertising Inches 1956
$ 593,964
$ 95,512
12,507
5,118
473,380
1957
642,613
94,987
13,131
5,272
481,716
1958
688,7 47
99,138
13,866
5,220
459,071
1959
779,797
126,527
14,795
5,372
494,788
1960
885,663
138,325
15,423
5,656 529,477
1961
936,798
147,448
16,159
5,676
510,540
1962
1,004,486
149,677
16,861
5,938
537,182
1963
1,093,888 153,908
18,057
6,260
553,938
1964
1,279,578
232,385
19,238
7,008
630,766
1965
1,425,348
272,466
20,150
7,394
665,616
1966
1,513,649
259,739
21,160
7,796
687,239 (3) Redding Record, Inc. (a) For the Years 1961, 1962, and 1963
1961
1962
1963 Circulation income
$207,685
$ 214,833
$ 223,983
Advertising income
711,331
772,807
855,229
Miscellaneous income (shopping news, circulars, commercial printing, etc.)
17,782
16,846
14,676
Interest income
837
899
1,392
Gain on sale of capital assets
-0-
227
2,322
Total Income
$937,635
$1,005,612
$1,097,602
Operating expense*
789,350
854,809
939,980
Interest expense
2,283
2,511
2,732
Operating income before federal income taxes
$146,002
$ 148,292
$ 154,890
Federal income taxes
70,421
71,551
74,416
Net profit after federal income taxes
$ 75,581
$ 76,741
$ 80,474 *Includes depreciation expense in the amounts of
$ 19,086
$ 20,220
$ 22,993
(b) For the Years 1964, 1965, and 1966
1964
1965
1966
Circulation income
$ 254,750
$ 284,159
$ 299,927
Advertising income
1,009,243
1,111,572
1,178,428
Miscellaneous income (shopping news, circulars, commercial printing, etc.)
15,585
29,617
35,294
Interest income
1,138
6,100
11,754
Total Income
$1,280,716
$1,431,448
$1,525,403
Operating expense*
1,047,193
1,152,882
1,253,909
Interest expense
2,953
3,399
3,822
Operating income before federal income taxes
$ 230,570
$ 275,167
$ 267,672
Federal income taxes**
106,124
124,867
117,126
Net profit after federal income taxes
$ 124,446
$ 150,300
$ 150,546 *Includes depreciation expense in the amounts of
$ 23,354
$ 23,993
$ 26,631 **After reduction for investment credits in the amounts of
$ 2,161
$ 713
$ 4,856
*265 (4) Redding Record, Inc. (a) As of December 31, 1961 and 1962 Assets
12/31/61
12/31/62 Cash on hand and in banks
$ 77,548
$101,248
Securities at cost
29,578
29,578
Notes and accounts receivable - net
76,394
84,990
Inventories and supplies
40,569
36,226
Land, buildings and equipment - net
281,910
291,614
Goodwill - purchased
13,219
13,219
Deferred charges
3,671
4,217
Miscellaneous assets
11,155
5,115
Total Assets
$534,044
$566,207
Liabilities and Capital
Current liabilities
$ 85,875
$ 85,010
Notes payable-non-current
41,854
45,540
Prepaid subscriptions
4,404
4,581
Miscellaneous non-current liabilities
6,658
7,081
Reserve for liability under employee profit sharing agreements
125,000
125,000
Capital stock (200 shares)
2,000
2,000
Earned surplus
268,253
296,995
Total Liabilities and Capital
$534,044
$566,207
(b) As of December 31, 1963 and 1964
Assets
12/31/63
12/31/64
Cash on hand and in banks
$ 96,379
$172,238
Securities at cost
38,003
38,003
Notes and accounts receivable - net
96,173
112,560
Inventories and supplies
29,693
16,855
Land, buildings and equipment - net
331,586
339,476
Goodwill - purchased
13,219
13,219
Deferred charges
5,315
5,568
Miscellaneous assets
3,252
3,252
Total Assets
$613,620
$701,171
Liabilities and Capital
Current liabilities
$ 95,251
$109,219
Notes payable-non-current
49,215
56,650
Prepaid subscriptions
4,731
5,723
Miscellaneous non-current liabilities
7,954
8,665
Reserve for liability under employee profit sharing agreements
125,000
125,000
Capital stock (200 shares)
2,000
2,000
Earned surplus
329,469
393,914
Total Liabilities and Capital
$613,620
$701,171
(c) As of December 31, 1965 and June 30, 1966
Assets
12/31/65
6/30/66
Cash on hand and in banks
$110,945
$ 60,300
Securities at cost
38,003
38,003
Notes and accounts receivable - net
276,950
293,172
Inventories and supplies
21,590
21,272
Land, buildings and equipment - net
325,602
328,808
New press - installation in process
-0-
63,691
Goodwill - purchased
13,219
13,219
Deferred charges
9,257
15,554
Miscellaneous assets
19,761
100
Total Assets
$815,327
$834,119
Liabilities and Capital
Current liabilities
$137,479
$ 95,813
Notes payable-non-current
63,700
63,700
Prepaid subscriptions
5,836
6,626
Miscellaneous non-current liabilities
9,098
9,030
Reserve for liability under employee profit sharing agreements
200,000
200,000
Capital stock (200 shares
2,000
2,000
Earned surplus
397,214
456,950
Total Liabilities and Capital
$815,327
$834,119
*266 (5) Securities owned by Redding Record, Inc. as of December 31, 1965 and June 30, 1966 Description
Cost $10,000 U.S. Treasury bonds - 3 1/8% of 5/15/68
$ 10,000
30,000 U.S. Treasury bonds - 2 1/2% of 6/15/69
28,003
Total
$ 38,003
ULTIMATE FINDINGS OF FACT As of June 26, 1966, the values per share of the stock owned by decedent and her husband were as follows: Scripps
$5,400
Tulare
400
Watsonville
2,200
Redding
4,500
OPINION VALUATION We must first determine the value as of June 26, 1966, of shares of stock owned by decedent and her husband as community property at decedent's death. Petitioner reported certain values on the decedent's estate tax return, and the Commissioner determined a deficiency of $92,166.95 based on higher values. The Commissioner lowered that deficiency to $52,215.67, based on values computed by his expert witness. In an amended petition, petitioner modified his position in accordance with the values computed by his expert witness. The following chart summarizes these various values: Return
Amended Petition
Original Deficiency
Modified Deficiency Scripps (per share)
$4,800
$4,394
$13,779
$9,500
Tulare (per share)
750
169
1,245
900
Watsonville (per share)
1,750
1,714
4,337
3,500
Redding (per share)
3,600
3,519
10,822
8,000
*267 Petitioner and the Commissioner presented the reports and testimony of two expert witnesses, both of whom were highly qualified to give expert opinions.Each expert used sophisticated analyses to determine the value of the shares under consideration. Petitioner's expert reviewed the financial data and the publishing facilities of each corporation and the market climate at the time of decedent's death. He examined valuation criteria and formulae proposed by various students of the newspaper industry. Of these formulae, he chose four which he believed representative and developed "Values of Total Enterprise by Principal Formulas" as follows: Krehbiel*
10 times 5-year mean net income
6-2/3 times excess of 5-year mean net income over 8% of net tangible assets, plus net tangible assets
13.1 times 1965 net income Scripps
$1,772,279
$1,532,270
$1,197,865
$2,005,714
Per Share
11,076
9,577
7,486
12,535
Tulare
321,702
135,080
121,390
301,876
Per Share
1,608
675
607
1,509
Watsonville
581,235
496,180
397,699
901,608
Per Share
2,906
2,480
1,988
4,508
Redding
1,149,079
1,015,080
857,084
1,968,930
Per Share
5,745
5,075
4,285
9,845
*268 Having indicated the values resulting from the application of these formulae, petitioner's expert examined data taken from the 1966 Moody's Manual concerning the Boston Herald-Traveler, Inc., the Cincinnati Enquirer, Inc., Dow Jones & Co., New York Times Co., and Times-Mirror Co. He concluded: The one company whose business is confined to that of newspaper publishing only, and in one locality, is the Cincinnati Enquirer, and in our opinion offers the best single comparable with the companies under valuation. Applying the same ratios to the companies under valuation gives the following results: Company
5-year P/E(14)
1965 P/E (12-1/2)
110% of gross
Div. Yield (5.5%)
Mean Scripps
$13,407
$11,962
$18,456
$8,727
$ 13,138
Tulare
946
1,441
2,382
0
1,192
Watsonville
3,473
4,302
4,071
3,182
3,757
Redding
7,105
9,394
7,830
6,545
7,718
*269 Having computed values which would have been appropriate if the companies had been transferred as complete enterprises and if the stock in the companies had been traded actively, petitioner's expert argued that the value of decedent's minority interests in closely held corporations was subject to a discount for lack of marketability. Using purchases by two investment companies in 1967 and 1968 of restricted shares of stock in corporations which also issued comparable publicly traded stock, he concluded that an appropriate discount "would certainly exceed 50 percent, and in our opinion would rise to 75 percent." Petitioner's expert concludes with the following "Valuation Summary": A purchaser of the shares of the Companies under valuation would acquire a highly unmarketable interest in Companies in which he had practically no influence upon management, and in which his expectancy could only be the dividend return, the value of which would be capitalizable at an appropriate discounted rate. In the case of two of the Companies (Watsonville Newspapers, Inc. and Redding Record, Inc.) the expectancy of increased dividends was high.In the case of one (Tulare Newspapers, Inc.) no dividend *270 had been paid during the preceding decade; revenues and net income were gradually increasing, but the necessity of eventually modernizing the presses would tend to postpone that expectation. In the case of John P. Scripps Newspapers the dividend was doubled in 1960, but had remained unchanged since, and the fluctuations in net income in the 5-year period, 1961-1965 (between $115,710 and $175,642), with the highest net in the earliest year, did not offer a basis for anticipating an early increase in the dividend. In the light of all the foregoing considerations it is our opinion that the shares of the instant Companies, on valuation date, if available and publicly marketable, would be appraised at the market at the mean of 10 times the five-year mean net profit and a capitalization of the dividend. In the case of the John P. Scripps Newspapers, the dividends, which have been secure and steady, would be capitalizable at 6 per cent, corresponding to the interest obtainable from time deposits in savings institutions. In the case of the Watsonville Newspapers, Inc. and Redding Record, Inc., an appropriate capitalization rate would be 4 per cent. In the case of Tulare Newspapers, Inc. *271 , which paid no dividends, the dividend capitalization rate would be zero. The results may be summarized as follows: 5-year P/E (19)
Dividend capitalized
Mean Scripps
$9,576
$8,000 (6%)
$8,788
Tulare
675
0
338
Watsonville
2,481
4,375 (4%)
3,428
Redding
5,075
9,000 (4%)
7,037
These values, in our opinion, would be subject to a discount for nonmarketability of at least 50 percent, or more, and at 50 percent discount the indicated fair market values are as follows: Scripps
$4,394
Tulare
169
Watsonville
1,714
Redding
3,519
The Commissioner's expert analysed the newspapers and balance sheets of each company. Using that analysis, he compared the stock owned by decedent to the stock of seven companies "primarily engaged in the newspaper industry": Boston Hearld-Traveler, Cincinnati Enquirer, Federated Publications, Globe-News Publishing Company, Maclean-Hunter Publications (Canadian), Stauffer Publications, and Toronto Star Limited (Canadian). Having determined relevant averages for those seven companies, he chose four of them as more nearly comparable to the companies the stock of which he was evaluating: Cincinnati *272 Enquirer, Federated Publications, Maclean-Hunter Publications, and Stauffer Publications. Having determined average relevant ratios of those four companies, the Commissioner's expert examined the relevant ratios of the Cincinnati Enquirer, which he considered most similar to the companies the stock of which he was evaluating. We have compiled the following chart summarizing the values determined by the Commissioner's expert: Scripps
Tulare
Watsonville
Redding Price-Net Tamgible Asset Ratio Of 7 na (335%)
$ 9,075
$1,431 d
Of 4 b
$ 3,367-
$ 8,677-
6,086 h
12,605 j
Cincinnati Enquirer (448.70%
12,155
2,140
3,303
6,897-
4,580 i
10,002 k
Price-Earnings Ratio Latest Year Of 7 na (16.48%)
1,237-
1,596 e
Of 4 b (14.45%)
10,545-
1,237-
20,168 c
1,857 f
h
j
Cincinnati Enquirer (12.73%)
10,808
1,197
i
k
5 Year Average
Of 7 a (22.04%)
e
Of 4 b (21.58%)
c
f
h
j
Cincinnati Enquirer (16.24%)
12,635
1,283
i
k
Dividend Yield Latest Year Of 7 a (2.73%)
e
Of 4 b (3.04%)
c
f
h
j
Cincinnati Enquirer (5.22%)
9,195
720 g
i
k
5 Year Average Of 7 a (2.11%)
e
Of 4 b (2.38%)
c
f
h
j
Cincinnati Enquirer (4.33%)
11,085
730 g
i
k
Value determined by Commissioner's expert
9,500
900
3,500
8,000
*273 *274 The reports and testimony of the two expert witnesses have aided us in our consideration of the evidence. Both reports were carefully prepared and suggested analyses which we have used in our independent determination of the value of the stock owned by decedent and her husband. Both experts have given us insights into the financial history and future of each of the companies. The use by the Commissioner's expert of comparative companies to develop ratios and formulae was helpful, but we have considered the sizes and capital structures of those "comparatives" in our own determination. Similarly, we have considered the review by petitioner's expert of literature containing formulae for the valuation of newspapers. We have also studied his lists of stocks purchased at discounts in our consideration of appropriate discounts. Cases of this kind would be better disposed of by the honest bargaining of the experts rather than by lengthy trials and conflicting testimony of those experts. Nevertheless, the parties in this case have come to us and have attempted to give us the knowledge of their experts. That the question of value is one of fact, to be decided after a consideration *275 of all the pertinent evidence and an application thereto of the judgment and experience of the trier of the facts, needs the citation of no authority. We have carefully considered all the evidence which the parties have offered and have attempted to follow in our own poor way the "ancient precedent established by a man whose name has become synonymous with wisdom." Webster Investors, Inc. v. Commissioner, 291 F.2d 192, 194 (C.A. 2, 1961), affirming a Memorandum Opinion of this Court. We state our application of that precedent to the pertinent facts without dissecting the individual factors underlying our findings, and we hold that the values per share of decedent's stock on June 26, 1966, were as follows: Scripps
$5,400
Tulare
400
Watsonville
2,200
Redding
4,500
Funeral Expenses The second issue presented involves the deductibility of decedent's funeral expenses. The Commissioner determined that, under California law, the entire community property, including the interest therein of decedent's husband, was chargeable with decedent's funeral expenses and that, under section 2053(a), that portion of the funeral expenses chargeable to the husband's *276 one-half interest in the community property could not be deducted from decedent's gross estate. The Commissioner relies on Pfeiffer v. United States, 310 F. Supp 392 (E.D. Cal. 1969), Estate of Mary V. Rowan, 54 T.C. 633, 641 (1970), Estate of Hugh C. Hutson 49 T.C. 495 (1968), and Rev. Rul. 70-156, 1970-1 C.B. 190. See also Estate of Henry James Davis, 51 T.C. 361, 369 (1968). [2]
Petitioner argues that the amounts paid for funeral expenses may be fully deducted from decedent's gross estate. He contends that a husband's funeral expenses are chargeable to community property only because that property is included in his gross estate and that, when a wife predeceases her husband, only her half of the community property is subject to the debts of her estate, including her funeral expenses. Petitioner relies on section 202 of the California Probate Code, In Re Cornitius' Estate, 154 Cal. app. 2d 422, 316 P.2d 438 (1957), *277 In Re Dennis' Estate, 110 Cal. app. 2d 667, 243 P.2d 579 (1952), and In Re Kurt's Estate, 83 Cal. app. 2d 681, 189 P.2d 528 (1948). Petitioner asks us to reconsider our holding in Estate of Mary V. Rowan, supra, that a wife's funeral expenses were not fully deductible. He argues that, in that case, we considered section 951.1 of the California Probate Code and did not consider the relevance of California Probate Code section 202, which, petitioner contends, establishes a distinction between the funeral expenses of a husband and those of a wife. We believe that our holding in Estate of Mary V. Rowan was correct. We need not analyze the complexities of the California statutes to determine whether the same sections establish the chargeability against the interests of both the husband and wife, for we find ample authority for the proposition that, in California, a husband's interest in community property must bear a portion of a wife's funeral expenses. In Odone v. Marzocchi, 34 Cal. 2d 431, 211 P.2d 297, 301-2 (1949), rehearing denied 212 P.2d 233 (1949), the Supreme Court of California held *278 that funeral expenses of a wife were chargeable against community property: Section 202 of the Probate Code provides in part that "Community property passing from the control of the husband, either by reason of his death or by virtue of testamentary disposition by the wife, is subject to his debts and to administration and disposal under the provisions of Division III of this code; * * *." The husband is liable for the necessaries of life furnished to the wife while the parties are living together. Civ. Code, sec. 174. [Now Civil Code 5130, added by Stats. 1969, c. 1608, p. 3343, sec. 8, operative January 1, 1970.] Medical expenses incurred during the last illness, and the funeral expenses, are such necessaries. * * * In Re Estate of Coffee, 19 Cal. 2d 248, 252, 120 P.2d 661, 664, this Court, in construing section 202, Probate Code, said that "* * * the portion of the community property which belongs to the wife is the one-half which remains after the payment of the husband's debts and the expenses of administration * * *." * * * In the Coffee case, the husband predeceased the wife so the reverse situation is presented. This would, however, seem to make no difference *279 in the result to be reached. This liability for a wife's funeral expenses does not seem to have been affected by either In Re Dennis' Estate, supra or the passage of section 951.1 of the California Probate Code. See Knego v. Grover, 208 Cal. App. 2d 134, 25 Cal Reporter 158, 165 (1962) and "Deductibility of Funeral Expenses - Time for a Change in California," August 1969 L.A.B. Bull. 426. Since California courts have held that community property is chargeable for the funeral expenses of a wife as well as a husband, we follow Pfeiffer v. United States, supra, and Estate of Hugh C. Hutson, supra, and hold that a portion of decedent's funeral expenses is not deductible from decedent's gross estate. In short, on this issue, we agree with the Commissioner's determination. Decision will be entered under Rule 155. Footnotes
*. Pursuant to a notice of reassignment sent to counsel for all parties, and to which no objections were filed, this case was reassigned by the Chief Judge on July 5, 1973 from Judge Austin Hoyt to Judge Norman O. Tietjens↩ for disposition. 1. In June 1970, the Commissioner secured an appraisal which suggested values lower than those originally determined for the shares of stock the values of which are in dispute. Accordingly, the Commissioner has made certain concessions and now asserts a deficiency of $52,215.67. ↩
*. Converted from twice weekly to three times weekly, April 1, 1963. ** Converted from three times weekly to daily and Sunday, June 1,1964. ↩
*. Mean of (a) gross income x 117% (use 120%); (b) population x $19.34 (use $20); (c) paid circulation x $39.30 (use $40); (d) after tax earnings x 12. The Krehbiel formula values dailies at the price computed after certain adjustments to that mean for strengths and weaknesses of the town, field, plant, economy, and general operation of the paper. ↩
d. Apparently, the Commissioner's expert used an asset ratio of 300% rather than 355%. ↩
b. The four companies are Cincinnati Enquirer, Federated Publications, Maclean-Hunter Publications, and Stauffer Publications. ↩
h. The Commissioner's expert states that, based on average yields, asset ratio, and P/E ratios of the four comparatives, "indicated value of Watsonville stock ranges from $3,367 per share to $6,086 per share. The low side of the range is attributed to the price net tangible asset ratio and the high side is attributable to five year average earnings and dividends." ↩
j. The Commissioner's expert gives only a range, $8,677 to $12,605, of Redding values derived from the four comparables. ↩
i. The Commissioner's expert gives only a range, $3,303 to $4,580, of Watsonville values derived from Cincinnati. ↩
k. The Commissioner's expert gives only a range, $8,677 to $12,605, of Redding values derived from Cincinnati. ↩
e. The Commissioner's expert gives only a range, $1,237 to $1,596, of values of Tulare stock derived from average P/E ratios and yields of the seven comparatives. ↩
c. In his report, having set forth the P/E ratios and yields, the Commissioner's expert states, "The average ratios of the four comparatives produce indicated values for Scripps ranging from $10,545 per share to $20,168 per share." We assume that those figures represent utilization of the yields as well as the P/E ratios. ↩
f. The Commissioner's expert gives only a range, $1,237 to $1,857, of values of Tulare stock derived from P/E ratios and yields of the four comparatives. ↩
a. The seven companies are Boston Herald-Traveler, Cincinnati Enquirer, Federated Publications, Globe-News Publishing Company, Maclean-Hunter Publications, Stauffer Publications, and Toranto Star Limited. ↩
g. In his computations of the value of Tulare stock, the Commissioner's expert "assumed a dividend potential equivalent to a 40 percent pay out of earnings, this amounts to a dividend of $37.60 per share for 1966 and a five year average dividend of $31.60 per share." ↩
2. The Comissioner notes that amounts paid after June 17, 1970, the effective date of an amendment to California Probate Code section 951.1 are fully deductible. See Rev. Rul. 71-168, 1971-1 C.B. 271↩.